IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

—————————————————————————

PATRICK JEANNITON,

          Plaintiff,

  v.

THE CITY AND COUNTY OF HONOLULU,
MARK FIESTA, Honolulu Police
Officer

         Defendants.

—————————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 20-00369 ACK-WRP

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 66)

While responding to a call reporting a domestic dispute, Defendant Mark Fiesta ("Officer Fiesta") and Corporal Len Fujinaka ("Corporal Fujinaka")[1] forcibly entered Plaintiff Patrick Jeanniton's residence without a warrant when Jeanniton physically resisted the officers' request to enter to ensure the safety of those inside. The officers subsequently arrested Jeanniton. Jeanniton filed this lawsuit on July 16, 2020, naming as defendants the City and County of Honolulu and Officer Fiesta (together, "Defendants"). Defendants have now moved for summary judgment on all claims. For the reasons set forth below, the Court GRANTS Defendants' motion.

---

[1] Corporal Fujinaka has not been named in this lawsuit.

## BACKGROUND

The following facts are principally drawn from the Parties' Concise Statements of Fact ("CSF"), ECF Nos. 67 and 80, which include audible videos from the officers' body-cameras ("bodycams"), Def. Exs. A, C, D & Pl. Exs. 8-H, 9-I.

## I.   Factual Background

Jeanniton is a 60-year-old physically fit 178-pound, 5'8" man who was formerly in the military and had training in hand-to-hand combat.  Def. Ex. F (Jeanniton Deposition) at 74:17-24 and 86:24-87:4; Def. Ex. A (Fiesta Bodycam).  In 2019, Jeanniton bench pressed 200-225 pounds, and squatted 370 pounds. Def. Ex. F at 87:5-13.  Jeanniton was previously a personal trainer at 24 Hour Fitness.  Jeanniton Decl. ¶ 28.

On January 28, 2019, Jeanniton and his girlfriend-Sisi Simei-were having an argument in their apartment about Simei's Facebook posts featuring her in bikinis and drinking beer.  Def. Ex. F at 75:20-76-5; Jeanniton Decl. ¶¶ 53-54.  Jeanniton "did not like the remarks addressed to [Simei] by the opposite sex replying in some of these posts."  Jeanniton Decl. ¶ 42.  At the time of the argument, Jeanniton was extremely angry, at a self-described level of 9 out of 10.  Def. Ex. F at 77:24-28:9.  The argument escalated, but Jeanniton did not hit Simei.  Jeanniton Decl. ¶ 53.  Jeanniton "went manic, but not violent" and he wanted Simei to leave.  Jeanniton Decl. ¶ 110.  Officer Fiesta

and Corporal Fujinaka were dispatched to what they were told was a domestic argument regarding a male and female.  Fiesta Decl. ¶ 2; Fujinaka Decl. ¶ 2.

Corporal Fujinaka arrived first on the scene around 9:50 p.m., and he was met by a few security officers and neighbors standing at the stairwell below Jeanniton's apartment. Fujinaka Decl. ¶¶ 2-3.  The neighbors informed him that they had heard "yelling" and "things slamming" in Jeanniton's apartment. Def. Ex. C (Fujinaka Bodycam I).

Officer Fiesta arrived shortly after Corporal Fujinaka, and from the street he heard a man yelling and what sounded like something breaking in the apartment.  Fiesta Decl. ¶ 3.  Both officers heard Jeanniton from his unit yelling, swearing, screaming "what the fuck you talking about."  See Def. Ex. C; Def. Ex. A; Def. Ex. F at 139:14-140:3 (Jeanniton agreeing in his deposition that he could be heard from the street in the bodycam footage).  The neighbors informed the officers that Jeanniton's girlfriend lived in the apartment with him and that she was "probably getting beat up."  Def. Ex. C; Def. Ex. A.

As the officers approached Jeanniton's apartment, they noticed that the unit was dark, and neither officer could see inside.  Fiesta Decl. ¶ 5; Fujinaka Decl. ¶ 5; see Def. Ex. A. According to Jeanniton, the lights in the unit were on,

3

Jeanniton Decl. ¶¶ 55, 87, but the shades completely obstructed the window near the front door.  See Def. Ex. C.  In his deposition, Jeanniton agreed that from the bodycam footage, he couldn't "see any [light from the exterior]."  Def. Ex. F at 140:20-24.

Officer Fiesta then opened the screen door to knock on the front door.  Def. Ex. A; Def. Ex. C.  The officers heard Jeanniton order Simei three times not to answer the door, Fiesta Decl. ¶ 6, and that if she opened the door she would be in trouble.  Fujinaka Decl. ¶ 6; see also Def. Ex. A ("If you open the door, you will be in trouble.").

Jeanniton testified that he knew it was the police at the door.  Def. Ex F. at 78:17-79:3.  Simei had gone downstairs to see who was at the door and upon looking through the peephole, saw it was the police and told Jeanniton "it's the cops."  Id. at 78:21-22.

For about a minute and a half, the officers spoke calmly to Jeanniton and asked him to open the door.  Def. Ex. C; Def. Ex. A.  Jeanniton then yelled, "What the fuck you want!" Id.  The officers responded by saying they wanted to talk.  Id.; Def. Ex. F at 143:8.  Jeanniton said, "No! Talk to me behind the door."  Def. Ex. C; Def. Ex. A; Def. Ex. F at 146:2-4.  The officers then asked Jeanniton what was going on, and asked "you mind opening up the shades? Where's your wife at?"  Def. Ex. C;

4

Def. Ex. A.  Jeanniton said that nothing was going on and demanded the officers go home.  Def. Ex. C; Def. Ex. A; Def. Ex. F at 152:22-24.  The officers said they could not leave until they talked to the woman inside.  Def. Ex. C; Def. Ex. A.

The officers reassured Jeanniton that he was not in trouble, but Jeanniton in his deposition said he did not hear them.  Def. Ex. F at 143:8-12.  In his deposition, Jeanniton testified that if he had heard such reassurance, he didn't "think it would have gotten that far because [the officers] deescalated the situation."  Id. at 143:20-24.

Jeanniton then yelled that he had no business with the police, he did not call the police, he is going to bed, he does not have a wife, and the woman in the unit with him is a stranger.  Def. Ex. C; Def. Ex. A; Def. Ex. F at 153:9-14.

When the officers said they needed to speak with the stranger Jeanniton referenced, Jeanniton yelled, "Sisi, go talk to these assholes, go outside and talk to them.  Sisi!"  Def. Ex. A.  Officer Fiesta then shouted "yeah, come talk to us assholes."  Id.

A few seconds later, Jeanniton opened the front door, and angrily said "look what she's done to my lip."[2/]  Jeanniton

---

[2/]   Jeanniton further states in his declaration that he told the officers that Simei had hit him with a bat.  Jeanniton Decl. ¶ 91.  However, only Jeanniton's similar statement after the physical altercation is apparently recorded by the bodycam footage.  See Def. Ex. A; Def. Ex. D.

Decl. ¶ 126; see Def. Ex. A; Def. Ex. D (Fujinaka Bodycam II).
Jeanniton held ice in one of his hands.  See Def. Ex. A; Def.
Ex. D.; but see Jeanniton Decl. ¶ 126 (explaining that he was
holding a plastic water bottle in his hand); Def. Ex. F at
157:3-8 ("Q: So before you said you were holding a water bottle
in your hand?  A: I thought it was a water bottle.  It's not a
water bottle.  Q: What is it?  A: I don't know.").  At this
point, Jeanniton was the angriest he had ever been in his life.
Def. Ex. F at 156:19-157:2.  Jeanniton was further upset because
"people called the cops for nothing."  Jeanniton Decl. ¶ 66.
The officers remained calm.  Def. Ex. F at 146:21-22 (Jeanniton
agreeing in his deposition that the officers were calm).

        According to Jeanniton, Simei was standing on the
third step behind him, where she could be seen.  Jeanniton Decl.
¶ 68.  However, prior to their physical altercation with
Jeanniton, Simei cannot be seen from either set of bodycam
footage.  See Def. Ex A; Def. Ex. C.  According to Jeanniton,
when the officers requested to see Simei, he said that she is
"right here" and gestured behind him.  Jeanniton Decl. ¶ 70.
Jeanniton acknowledged in his deposition that the bodycam
footage did not record him saying Simei was okay and that while
he was talking with the officers Simei is on the stairs with a
light behind her, but cannot be seen.  Def Ex. F at 159:17-161-
22.  Jeanniton also acknowledged in his deposition that it is

possible that he never told the officers that Simei was okay and was right behind him.  Id. at 170:20-171-3.

Corporal Fujinaka described the situation at that point in the following manner:

> The Plaintiff responded with denying to [sic] our request to speak to any individuals within with [sic] angry, aggressive profanities.  I audibly observed him tell the female not to open the door or she would be in trouble or there would be problems or trouble.  I thought I heard the female say that she was in trouble and the fear in her voice.
>
> At that point, I believed the female inside the unit was injured or possibly injured.  I was very concerned for the female inside because the neighbors believed the female may have been injured, I heard objects being thrown (possibly at someone else) and break, Plaintiff was extremely angry and yelling, Plaintiff was preventing us from seeing or speaking with the female inside, and the female said she was in trouble.  In my experience and training, domestic abusers tend to try to control the victims and prevent them from speaking with police or getting treatment.

Fujinaka Decl. ¶¶ 6-7.

Jeanniton raised his hand in the air, stepped out of the apartment, assumed an aggressive stance, and pointed at Officer Fiesta.  Def. Ex. C; Def. Ex. A; Def. Ex. F at 158:6-24; Jeanniton Decl. ¶ 73.  Jeanniton yelled that she was lucky he was not going to press charges, pointed to his lip, and told the officers "fuck you."  Def. Ex. C; Def. Ex. A.  Jeanniton then made some type of backhanded motion with his hand.  Def. Ex. C; Def. Ex. A; Def. Ex. F at 159:15-16 ("That was a motion to go

away").  Officer Fiesta shouted, "Don't point!"  Jeanniton Decl.
¶ 75.

Jeanniton quickly stepped inside his apartment and
attempted to close his front door, but Officer Fiesta used his
leg and body to keep the door open.  Fiesta Decl. ¶ 8.  After
Officer Fiesta had stepped inside the residence, Jeanniton then
swung at Officer Fiesta.  Id. ¶ 9; Def. Ex. C; Def. Ex. A.
Officer Fiesta moved his head to avoid the blow, and Jeanniton
grabbed Officer Fiesta with his left arm.  Def. Ex. C.  Officer
Fiesta attempted to escort Jeanniton to the ground, but
Jeanniton was not compliant.  Fiesta Decl. ¶ 9.

Officer Fiesta attempted to handcuff Jeanniton's
wrist, but was unsuccessful.  Fiesta Decl. ¶ 10.  Officer Fiesta
ordered Jeanniton to "stop resisting" and "let go."  Def. Ex. A.
Officer Fiesta also tried to gain Jeanniton's right hand, but
Jeanniton continued to pull his hand away.  Fiesta Decl. ¶ 11.
Officer Fiesta then unsuccessfully used a closed right fist to
strike Jeanniton's left torso area to gain compliance.  Pl. Ex.
15K.  Officer Fiesta next told Corporal Fujinaka he was going to
deploy his pepper spray, but Corporal Fujinaka told him not to.
Id.

Corporal Fujinaka applied a vascular neck restraint to
Jeanniton in order to gain compliance.  Fujinaka Decl. ¶ 13.  As
instructed during training, Corporal Fujinaka did not apply the

vascular neck restraint to obstruct Jeanniton's breathing.
Fujinaka Decl. ¶ 14.  Once Officer Fiesta was able to handcuff
Jeanniton, Corporal Fujinaka stopped all use of force.  Id.
Officer Fiesta did not put Jeanniton in a chokehold or vascular
neck restraint.  Fiesta Decl. ¶ 13; Fujinaka Decl. ¶ 15.

During the physical altercation, Simei can be briefly
seen walking down the stairs, turning on the lights, and
shouting at everyone to stop.  See Def. Ex. A; Def. Ex. C.  The
officers were focused on physically subduing Jeanniton by the
door, whereas the stairs were situated about a dozen or more
feet off to the right.  See Def. Ex. A; Def. Ex. C.  Officer
Fiesta stated that Jeanniton never told the officers that Simei
was okay, or that they could see her.  Fiesta Decl. ¶ 15.  As
previously noted, Jeanniton acknowledged in his deposition that
the bodycam footage did not record him saying Simei was okay and
that while he was talking with the officers Simei is on the
stairs with a light behind her, but cannot be seen.  Def Ex. F
at 159:17-161-22.  Jeanniton also acknowledged in his deposition
that it's possible that he never told the officers that Simei
was okay and was right behind him.  Id. at 170:20-171-3.

Jeanniton has no memory after Officer Fiesta stopped
Jeanniton from closing the front door.  Def. Ex. F at 162:12-16
("My mind is gone").  After Jeanniton was subdued, Corporal
Fujinaka explained to Jeanniton how to recover from the

chokehold, to sit up when comfortable, to breathe heavily, asked if Jeanniton was okay, and subsequently put a pillow under Jeanniton's head to make him more comfortable.  See Def. Ex. D. When Jeanniton eventually sat up with handcuffs on, blood and broken glass can be seen on the floor.  Id.  Officer Fiesta asked Corporal Fujinaka if Jeanniton swung at him and after Corporal Fujinaka confirmed, Officer Fiesta said Jeanniton will be arrested for "just harassment."  Id.

Simei then gave Officer Fiesta a witness statement, telling him that the fight was over her Facebook posts.  Id. Officer Fiesta then asked Simei if she is "injured in any way or just verbal?"  Id.  In the background, Jeanniton can be heard saying his handcuffs are "too tight," and Corporal Fujinaka explained, "it's not meant to be comfortable."  Id.

Jeanniton asked the officers to take Simei out of the apartment then, "which is why [Jeanniton] said she hit [him] with a bat."  Jeanniton Decl. ¶ 91.  Jeanniton then repeated to Corporal Fujinaka "she hit me on my lip," and Corporal Fujinaka responded, "that's not from her.  You don't remember?"  Def. Ex. D.  Jeanniton answered "no, I'm on medication."  Id.  Jeanniton again stated "she hit me in my lip, I'm telling you, I had ice in my hand, I'm pressing charges, it's from her, I have proof of battery."  See Def. Ex. D.

In his deposition, Jeanniton testified that he was manic that night, but not at the time he "was talking to [Simei]." Def. Ex. F at 126:12-19. Before Jeanniton was arrested and taken to the hospital, Corporal Fujinaka asked Simei to retrieve Jeanniton's medication for him. Def. Ex. D.

Jeanniton was arrested for harassment, without incident. See Def. Ex. F at 117-120. Both officers checked Jeanniton's handcuffs. Def. Ex. D; Fiesta Decl. ¶ 16; Fujinaka Decl. ¶ 16. While Jeanniton was still in the recovery position, he told Corporal Fujinaka "my arm, take these off" and Corporal Fujinaka responded, "I'm sorry I can't do that right now." Def. Ex. D. Officer Fiesta stated he never heard Jeanniton complain that the handcuffs were too tight. Fiesta Decl. ¶ 17. The officer who transported Jeanniton to the hospital replaced Officer Fiesta's handcuffs with her own, checked the tension, and deemed it appropriate. Kaluhiokalani Decl. ¶ 4. Officer Fiesta's handcuffs were on Jeanniton for approximately ten minutes. Fiesta Decl. ¶ 18. Jeanniton was treated at the hospital before he was transported to the police station, where he spent the night in jail. Def. Ex. F at 117:13-17.

As a result of the incident, Jeanniton testified he had a swollen eye, a cut lip and tongue, and a three-inch long scratch and swelling to on his left wrist. Def. Ex. F at 123:18-124:7. Jeanniton had no broken bones, strains, sprains,

11

torn ligaments, or concussions.  Id. at 107-114.  Jeanniton's injuries healed completely.  Id. at 114:11-14.

Neither Officer Fiesta nor Corporal Fujinaka knew Jeanniton prior to the incident and Officer Fiesta stated that he had no basis for ill will against Jeanniton.  Def. Ex. F at 97:10-17; Fiesta Decl. ¶¶ 19-20.  Jeanniton was ultimately charged with harassing Officer Fiesta, which was dismissed in court.  See Def. Ex. G.

## II.  Procedural Posture

Jeanniton filed this lawsuit in Hawaii state court on July 16, 2020.  See ECF No. 1.  Defendants then removed this case to federal court on August 26, 2020.  Id.  In the First Amended Complaint, Jeanniton alleges that Officer Fiesta entered his residence without justification, assaulted him, and falsely arrested him using excessive force.  See ECF Nos. 1-2 ¶¶ 8-17.

On March 16, 2021, Jeanniton sought leave to file a proposed Second Amended Complaint.  See ECF No. 25 at 16-19.  Magistrate Judge Porter granted Jeanniton's request for leave to assert a Section 1983 claim against Officer Fiesta in his individual capacity for violations of the First and Fourth Amendments.  See ECF No. 39 at 18-19.  However, Judge Porter denied Jeanniton's request for leave to assert:  (1) a Section 1983 claim against Officer Fiesta in his individual capacity for violations of the Fourteenth Amendment, (2) a Section 1983 claim

against the City and County of Honolulu, and (3) a Section 1983 claim against Officer Fiesta in his official capacity.  Id.

Jeanniton then filed a Second Amended Complaint.  ECF No. 44.  Shortly thereafter, the parties met and conferred and submitted a stipulation seeking partial dismissal of certain claims against Defendants under Rule 41(a)(1)(A)(ii).  See ECF No. 45.  Magistrate Judge Porter construed the parties' stipulation as written consent to file an amended complaint under Rule 15(a)(2) and ordered Plaintiff's amended complaint to conform to the stipulation by removing the following claims: all 42 U.S.C. § 1983 claims against the City and County of Honolulu, all 42 U.S.C. § 1983 claims against Defendants for violations of the Fifth, Sixth, Eighth, Ninth, Twelfth, and Thirteenth Amendments to the United States Constitution, all claims for injunctive relief against Defendants, all claims for punitive damages against the City and County of Honolulu, and all 42 U.S.C. § 1983 claims against Defendant Fiesta in his official capacity.  Id.

On May 14, 2021, Jeanniton filed a Third Amended Complaint, ECF No. 48.[3/]  On May 18, 2021, Defendants filed a Motion for Partial Dismissal of Third Amended Complaint, Motion

---

[3/]   Jeanniton refers to the Third Amended Complaint as a "Second Amended Complaint."  Because Jeanniton had already filed a Second Amended Complaint, ECF No. 44, the Court refers to ECF No. 48 (the operative complaint) as the Third Amended Complaint.

to Strike Fourteenth Amendment Claim, Motion to Strike New

Allegations, and Motion for Enlargement of Time to Answer the

Third Amended Complaint.  ECF No. 49.  In its Order Granting

Defendants' Motion to Strike Fourteenth Amendment Claim,

Granting in Part and Denying in Part Defendants' Motion to

Strike New Allegations and Request for Injunctive Relief, and

Granting in Part and Denying in Part Defendants' Motion for

Partial Dismissal ("Prior Order"), the Court found:

1.  To the extent that Count VII asserts a claim against Officer Fiesta in his individual capacity for violations of the Fourteenth Amendment, it is STRICKEN.
2.  Defendants' request to strike new factual allegations is DENIED.
3.  Jeanniton's request for injunctive relief in the Third Amended Complaint is STRICKEN.
4.  To the extent that Counts I-IV assert violations of the Hawaii State Constitution, they are DISMISSED WITH PREJUDICE.
5.  Given that Jeanniton's request for a declaratory judgment is duplicative, it is DISMISSED WITH PREJUDICE.
6.  Defendants' Motion for Partial Dismissal of Jeanniton's First Amendment claim is DENIED.
7.  Defendants' Motion for Partial Dismissal of Jeanniton's Fourth Amendment warrantless entry claim is DENIED.
8.  To the extent Jeanniton is asserting punitive and exemplary damages against the City, they are STRICKEN as against the City.

ECF No. 63.  Jeanniton's remaining claims include:  Fourth

Amendment warrantless entry, excessive force, false arrest and

malicious prosecution, First Amendment retaliation, and state

law claims for malicious prosecution, intentional infliction of

emotional distress, assault, and battery.  ECF No. 48.

On October 6, 2021, Defendants filed their motion for summary judgment, ECF No. 66, and CSF in support, ECF No. 67. Jeanniton filed his Opposition, ECF No. 80, on February 15, 2022.[4/]  On February 22, 2022, Defendants filed a Reply, ECF No. 82.  A hearing on the motion was held on March 8, 2022.

## STANDARD

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of

---

[4/]  Jeanniton attached to his Opposition a document entitled "Declaration of Counsel," signed by his attorney, and states that "The Declarant, [Jeanniton's attorney] . . . says he is the Plaintiff in the above entitled matter."  The 16-page-long declaration is rife with inappropriate argument and statements for which Jeanniton's attorney would have no personal knowledge of.  Further, the Court notes that the declaration in many respects is contradicted by Jeanniton's deposition, which occurred prior to the declaration and controls.  See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (explaining that uncorroborated allegations and "self-serving testimony" do not create a genuine issue of material fact); Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citation and internal quotation marks omitted and emphasis removed); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

        "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202). When considering the evidence on a motion for summary judgment,

16

the court must draw all reasonable inferences on behalf of the nonmoving party.  Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (internal citation and quotation omitted)).

## DISCUSSION

As discussed above, the Court must consider and decide Defendants' summary judgment motion seeking dismissal of Jeanniton's (1) Fourth Amendment claims for warrantless entry, excessive force, false arrest, and malicious prosecution, (2) First Amendment claim of retaliation, and (3) state law claims for malicious prosecution, intentional infliction of emotional distress, assault, and battery.

First, the Court addresses Jeanniton's Fourth Amendment warrantless entry claim and finds that because the emergency aid and exigent circumstances exceptions apply, summary judgment is appropriate, and in any event Officer Fiesta is entitled to qualified immunity.  The Court next evaluates Jeanniton's excessive force, false arrest, malicious prosecution, and retaliation claims and finds that no genuine issue of material fact has been established by Jeanniton, and in

any event Officer Fiesta is again entitled to qualified immunity.  Finally, the Court turns to the state law claims, punitive damages, and respondeat superior.

## I.   Fourth Amendment Claims

### a. Warrantless Entry Claim

The Court first turns to Defendants' argument asserting that Officer Fiesta is entitled to summary judgment on Jeanniton's Fourth Amendment warrantless entry claim because Officer Fiesta has established both the exigency and emergency aid exceptions apply to the officers' warrantless entry.

The general rule is that "searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980).  There are, however, established exceptions to the warrant requirement.  United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001).  When a search occurs without a warrant, the burden of proof rests on the government to justify the search under one of the exceptions to the warrant requirement.  See Rodriguez v. City of San Jose, 930 F.3d 1123, 1137 (9th Cir. 2019).

Courts have looked to the exigent circumstances and emergency aid exceptions to determine whether a warrantless entry may be made when police are responding to a domestic

violence call.  Torres v. Hansen, No. 16-cv-06607-SI, 2019 WL 4142158 (N.D. Cal. Aug. 30, 2019).

An officer may make a warrantless entry when "the exigencies of the situation," considered in a case-specific way, create "a compelling need for official action and no time to secure a warrant."  Lange v. California, 141 S. Ct. 2011, 2013, 210 L. Ed. 2d 486 (2021) (quoting Kentucky v. King, 563 U.S. 452, 460, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011)).[5]  The exception applies when there are "circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."  United States v. Brooks, 367 F.3d 1128, 1135 (9th Cir. 2004) (internal citation omitted).

The Ninth Circuit has declined to find "that domestic abuse cases create a per se exigent need for warrantless entry," and instead requires courts to "assess the total circumstances, presented to the law officer before a search, to determine if exigent circumstances relieved the officer of the customary need

---

[5]  At the hearing, Jeanniton continued to erroneously rely on Lange. But as discussed in the Prior Order, Lange is a case in which the Supreme Court ruled that pursuit of a fleeing misdemeanor suspect does not categorically justify a warrantless entry into a home.  Because Jeanniton was not fleeing from the officers into his home, the analysis in Lange is inappropriate here.

for a prior warrant." Id. at 1136.  Specifically, "[w]hen the domestic violence victim is still in the home, circumstances may justify an entry pursuant to the exigency doctrine."  Bonivert v. City of Clarkston, 883 F.3d 865, 878 (9th Cir. 2018) (internal citation omitted).

The second relevant exception-the emergency aid exception-permits officers to enter a home without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  Brigham City, Utah. v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006); see also Bonivert, 883 F.3d at 876 (emergency aid exception did not apply because the house was silent; the alleged victims of domestic violence were outside the house and had assured officers there were no weapons in the house as well as that the husband inside the house did not pose a danger to himself).  An entry pursuant to the emergency aid exception is reasonable under the Fourth Amendment regardless of the individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." Stuart, 547 U.S. at 404, 126 S. Ct. at 1948 (internal citation omitted).  However, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  Welsh v. Wisconsin, 466 U.S. 740, 749-50, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984).

Jeanniton relies on this Court's analysis of <u>Brooks</u> at the motion to dismiss phase, copying paragraphs of the Prior Order in his Opposition.  <u>See</u> Opp. at 8.  In <u>Brooks</u>, an officer made a warrantless entry into a hotel room after receiving a 911 call that "a woman in Brooks's room was being beaten, a serious danger."  <u>Brooks</u>, 367 F.3d at 1134.  Notably, when Brooks opened the hotel door, he indicated that there was a woman present, but the officer was unable to see her.  <u>Id.</u>

At the motion to dismiss phase, this Court found <u>Brooks</u> to be distinguishable on two major grounds:

> Here, unlike in <u>Brooks</u>, the neighbor who called the police did so because of a "verbal discussion," without any explicit allegation of domestic abuse.  Second, during Jeanniton's conversation with the officers, Jeanniton's girlfriend stood behind him on the stairs "to show the officers that there were no marks or injuries on her and she did not call for, want, or need any help." TAC ¶ 12.  It would not be reasonable under these circumstances for the officers to believe that Jeanniton or his girlfriend required immediate aid, thus triggering the emergency aid exception to the warrant requirement.

Prior Order at 30.  On summary judgment, those differences dissipate.

Now, Defendants have come forward with evidence that Officer Fiesta and Corporal Fujinaka were dispatched to what they were told was a domestic argument regarding a male and female.  Fiesta Decl. ¶ 2; Fujinaka Decl. ¶ 2.  When the officers arrived at the scene, neighbors informed them that Jeanniton's girlfriend lived in the apartment with him and that

she was "probably getting beat up."  Def. Ex. C; Def. Ex. A.
Further, after the officers calmly and repeatedly requested that
they be allowed to enter and that they cannot leave until they
had been allowed to enter and see to the woman,[6/] Jeanniton
yelled that he did not call the police and subsequently opened
the door and angrily told the officers to look at what Simei had
done to his lip.[7/]  Jeanniton Decl. ¶ 126; see Def. Ex. A; Def.
Ex. D.  The Court finds that this statement by Jeanniton would
suggest to a reasonable officer that there had been some
physical encounter between Simei and Jeanniton.  See Bonivert,
883 F.3d at 877 ("[The officer] offered no objectively
reasonable basis to suggest that Bonivert could harm a third
party, as Bonivert was alone in the residence").

Further, Jeanniton in his declaration insists that
Simei was standing on the third step of the stairs behind him
where she could be seen, Jeanniton Decl. ¶ 68.  However, both
officers are firm that at no point prior to entry could they see
Simei.  Fiesta Decl. ¶ 15; Fujinaka Decl. ¶ 17; Def. Ex. A; Def.

---

[6/] Defendants argue that Hawaii law actually required Officer Fiesta to
see Simei.  Mot. at 15.  While it is true that HRS 709-906(4)(a) requires the
officer to "make reasonable inquiry of the family or household member upon
whom the officer believes physical abuse or harm has been inflicted," the
Court does not agree with Defendants' interpretation of the text as requiring
Officer Fiesta to "see" Simei.

[7/] Again, Jeanniton further states in his declaration that he told the
officers that Simei had hit him with a bat.  Jeanniton Decl. ¶ 91.  However,
only Jeanniton's similar statement after the physical altercation is
apparently recorded by the bodycam footage.  See Def. Ex. A; Def. Ex. D.
Further, at the time of the incident Jeanniton was extremely angry and at his
deposition he admitted that he has limited memory of the incident.  See Def.
Ex. F at 162:12-16.

Ex. C.  Moreover, in his deposition, Jeanniton acknowledged that the officer's bodycam established that Simei could not be seen by the officers until after they were fully engaged in trying to subdue Jeanniton, who had forcibly resisted their entry into the residence.  Def. Ex. F at 159:17-161-22.  Jeanniton further admitted after viewing the bodycam evidence that it is possible that he never told the officers that Simei was okay, or that they could see her.  Id. at 170:20-171-3.  Later, Simei told the officers that Jeanniton would not allow her to go to the door. Def. Ex. A; Fiesta Decl. ¶ 14.

Here as in Brooks, Officer Fiesta's entering the apartment was justified by the officers having been told (1) by neighbors prior to entering the apartment that there was screaming and yelling and things slamming in the apartment and the woman was probably being beaten, Def. Ex. C; Def. Ex. A., and (2) by Jeanniton telling the officers "look what [Simei] did to my lip," indicating a physical confrontation between Simei and Jeanniton.  Thus, the Court finds that the officers had an objectively reasonable belief that a woman and/or man might be injured, and entry was "necessary to prevent physical harm" to her/him.  Brooks, 367 F.3d at 1135; Bonivert, 883 F.3d at 877. Defendants are "entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest

[Jeanniton]." Hunter v. Bryant, 502 U.S. 224, 228, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991).

Accordingly, the Court finds both the exigency doctrine and the emergency aid exception to apply. Loud fighting-including shouting and things breaking-had been heard by neighbors, the officers interacted with Jeanniton while he was at a self-described temper level 9 out of 10, and Simei was still within the premises but not visible to the officers. The officers had probable cause to suspect evidence of a crime and had an exigent need to enter the premises to make sure that the victim was safe and protected from imminent injury.

Further, the Court finds that Jeanniton has failed to establish any genuine issue of material fact regarding the warrantless entry or that Officer Fiesta (again, the only officer named as a defendant) lacked probable cause, and that no reasonable jury would find to the contrary.

### i. Qualified Immunity

The Court has determined there was no violation of the Fourth Amendment with respect to the warrantless entry, and now the Court continues its analysis and finds that Officer Fiesta is also entitled to qualified immunity with regard to that claim.

"Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise

24

power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

To determine whether an officer is entitled to qualified immunity, a court considers "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." Jessop v. City of Fresno, 936 F.3d 937, 940 (9th Cir. 2019) (internal quotations omitted).

Although qualified immunity involves a two-step analysis, a court may exercise its discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional. Pearson, 555 U.S. at 236–39, 129 S. Ct. at 808; Orn v. City of Tacoma, 949 F.3d 1167, 1174 (9th Cir. 2020); see also District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7, 199 L. Ed. 2d 453 (2018) ("We continue to stress that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." (quoting Camreta v. Greene, 563 U.S. 692, 707, 131 S. Ct. 2020, 179 L. Ed. 2d 1118 (2011))).

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have

understood] that what he is doing violates that right . . .  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (internal quotations omitted).  "This demanding standard," the Supreme Court has said, "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Wesby, 138 S. Ct. at 589 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

Where there has been a warrantless entry by police of a person's home, that entry violated "clearly established law" if it was "clearly established" that none of the exceptions to the warrant requirement applies.  Bonivert, 883 F.3d at 879.

Here, the officers were unable to see Simei and whether she was injured, and given Jeanniton's demeanor, the officers could have had a reasonable belief that injury was imminent.  The officers had been told (1) by neighbors prior to entering the apartment that there was screaming and yelling and things slamming in the apartment and the woman was probably being beaten, Def. Ex. C; Def. Ex. A., and (2) by Jeanniton telling the officers "look what [Simei] did to my lip."  See Maric v. Alvarado, 748 Fed. App'x 747, 751 (9th Cir. 2018) (denying qualified immunity on the basis of the exigent circumstances exception because the officers saw prior to any

physical confrontation that there was no actual injury to the woman and the children, the officers had already removed Maric from the residence, and there was no evidence from which the officers could reasonably believe injury was imminent).

While Jeanniton is not required to identify a case directly on point for the right to be clearly established, existing precedent must have placed the constitutional question beyond debate. Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 211 L. Ed. 2d 164 (2021). Jeanniton has failed to provide any factually similar case. The Court, having found none, therefore finds that the entry did not violate clearly established law. See id.; City of Tahlequah, Oklahoma v. Bond, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021).

Moreover, the United States Supreme Court has held that qualified immunity protects an officer from civil liability for conducting a warrantless search of a residence if a reasonable officer could have believed the warrantless search to be lawful, in light of clearly established law and the information the officer possessed. Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040, 97 L. Ed. 2d 523 (1987)); Bryant, 502 U.S. at 227, 112 S. Ct. at 536. Here, the Court finds a reasonable officer could have held such a belief under the subject circumstances.

Because both the exigent circumstances and the
emergency aid exceptions to the warrant requirement are
applicable here, and because Officer Fiesta is entitled to
qualified immunity since the entry did not violate clearly
established law, the Court GRANTS Defendants summary judgment on
Jeanniton's Fourth Amendment warrantless entry claim.

### b. Excessive Force Claim

With respect to Jeanniton's excessive force claim, the
Court finds that Officer Fiesta (the only officer named as a
defendant) (1) did not commit excessive force either by
assisting in subduing Jeanniton or handcuffing him and, (2)
further is entitled to qualified immunity.

To evaluate the reasonableness of the force used, the
Court must "balance 'the nature and quality of the intrusion on
the individual's Fourth Amendment interests' against 'the
countervailing government interests at stake.'" Miller v. Clark
Cty., 340 F.3d 959, 964 (9th Cir. 2003) (quoting Graham v.
Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443
(1989)). The Court must consider "the type and amount of force
inflicted" as well as "(1) the severity of the crime at issue,
(2) whether the suspect posed an immediate threat to the safety
of the officers or others, and (3) whether the suspect was
actively resisting arrest or attempting to evade arrest by
flight." Id. Moreover, "[t]he calculus of reasonableness must

28

embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97, 109 S. Ct. 1865.

### i. Officer Fiesta's Use of Force

Considering the facts of this case against the applicable body of law, the Court concludes that Officer Fiesta did not violate clearly established law and instead used appropriately gradual force when he took Jeanniton to the ground, told him to stop resisting, unsuccessfully attempted to control his hands, tried to put Jeanniton in handcuffs, and used his closed fist to strike Jeanniton's left torso[8] in a further effort to control Jeanniton's hands.  Officer Fiesta then started to remove his spray gun in a further effort to control Jeanniton, but was told by Corporal Fujinaka not to utilize the spray gun.  Pl. Ex. 15K.  Officer Fiesta did not put Jeanniton in a chokehold or vascular neck restraint.  Fiesta Decl. ¶ 13; Fujinaka Decl. ¶ 15.

---

[8]  The declarations of Officer Fiesta and Corporal Fujinaka state that Officer Fiesta did not beat Jeanniton.  See Fiesta Decl. ¶ 4 ("I did not shove, grab, beat, or assault" Jeanniton); Fujinaka Decl. ¶ 15 ("Officer Fiesta did not beat or assault" Jeanniton).  Counsel for Defendants explained at the hearing that "beat" connotes repeated hitting and thus the declarations are consistent with the fact that Officer Fiesta used a closed fist to strike Jeanniton once in his left torso.  See also Webster's Third New International Dictionary of the English Language (1993) (defining "beat" as "to strike ... [or] hit repeatedly with [a] hand, fist, weapon, or other instrument so as to inflict pain[,] as in order to punish or warn.").

Moreover, Officer Fiesta's use of force was in direct response to Jeanniton's swing at him, compounded by Jeanniton's earlier refusal to open the door and let the officers see him or Simei and his refusal to comply with officer commands.  See Mattos v. Agarano, 661 F.3d 433, 445 (9th Cir. 2011) (evaluating whether the plaintiff "bears some responsibility for the escalation of the incident" in the context of qualified immunity).  Jeanniton's failure to follow "lawful commands, and [his] actions" in making threatening gestures and his subsequent attack on Officer Fiesta "risked severe consequences."  See Ames v. King Cty., Washington, 846 F.3d 340, 349 (9th Cir. 2017). The Court finds that governmental interests in officer safety, investigating a possible crime, and controlling an interaction with a potential domestic abuser outweigh the intrusion upon Jeanniton's rights.

Furthermore, the Court finds that "less intrusive alternatives" would not have sufficed to bring Jeanniton under control, especially when Jeanniton had refused to heed several warnings to stop resisting.  See Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 947 (9th Cir. 2017); see also Rivas-Villegas, 142 S. Ct. at 4 (holding that officer's conduct in placing his knee on suspect's back for no more than eight seconds, and only on the side of his back near the knife that officers were in the process of retrieving, did not violate a

clearly established right against excessive force); Bond, 142 S. Ct. at 9 (finding that officers who shot and killed suspect after suspect raised hammer behind his head and took stance as if he was about to throw the hammer or charge at the officers, did not violate any clearly established law).  Both officers found Jeanniton to be extremely strong and that he almost overwhelmed them.  Fiesta Decl. ¶ 9; Fujinaka Decl. ¶ 12.  The officers stated that they feared for the safety for the woman inside and their own safety.  See Fujinaka Decl. ¶¶ 12-13; Fiesta Decl. ¶ 10 ("He was close to my gun and I was worried if he overpowered me he could grab my weapon and injure myself or others.").  While Jeanniton suffered some abrasions during this episode, his injuries were relatively minor.[9/]

Further, the Court finds that Jeanniton has failed to establish any genuine issue of material fact showing excessive force on the part of Officer Fiesta or that he lacked probable cause, and that no reasonable jury would find to the contrary.

In any event, as discussed infra, the Court finds Officer Fiesta is entitled to qualified immunity on Jeanniton's entire excessive force claim.

---

[9/]  While Jeanniton has mentioned other injuries in his subsequent self-serving declaration, the Ninth Circuit has limited him to those he has described in his earlier deposition.  See Publ'g Clearing House, Inc., 104 F.3d at 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); Yeager, 693 F.3d at 1080 ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

31

### ii. Vascular Neck Restraint[10]

In his declaration, Jeanniton states that "the two [officers] choked me unconscious.  One of them could not have done it alone.  They acted together assaulting me intentionally."  Jeanniton Decl. ¶¶ 127-129; Opp. at 24.

The Ninth Circuit has repeatedly found that the use of a chokehold or a vascular neck restraint on a non-resisting person violates the Fourth Amendment's prohibition on the use of excessive force.  Tuuamalemalo, 946 F.3d at 477 (observing that "[t]here is a robust consensus among the circuits that the use of a chokehold on a non-resisting person violates the Fourth Amendment" and collecting cases); Barnard v. Theobald, 721 F.3d 1069, 1076 (9th Cir. 2013); Hunter v. City of Federal Way, 806 Fed. App'x 518, 520 (9th Cir. 2020) (finding the officer

---

[10] A lateral vascular neck restraint restricts the flow of blood to the brain rather than restricting air flow. Tuuamalemalo, 946 F.3d at 475; McBride v. Yates, No. ED CV 06-1322-PA(PJW), 2008 WL 1817248, at *2 (C.D. Cal. Apr. 18, 2008) ("Although [the lateral vascular neck restraint] is commonly called a chokehold, its purpose is not to cut off air going to the lungs, but rather to cut off blood going to the brain-to make [the subject] pass out briefly so he or she will stop struggling.") (internal quotation omitted).  The Supreme Court has described the carotid restraint, of which the lateral vascular neck restraint is a form, as a restraint in which "an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand.  The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck." Estate of Booker v. Gomez, 745 F.3d 405, 413 n.6 (10th Cir. 2014) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 98 n.1, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)).  This is distinct from the more dangerous "bar arm hold," which "applies pressure at the front of the subject's neck, . . . reduces the flow of oxygen to the lungs, and may render the subject unconscious." Id.

violated plaintiff's clearly established rights when he applied a chokehold after plaintiff was restrained).

In Tuuamalemalo, the plaintiff was not resisting arrest and five police officers had fully restrained him and were pinning him to the ground when another officer applied a vascular neck restraint. Tuuamalemalo, 946 F.3d at 478. The Ninth Circuit held under the case law that these facts clearly established a violation of the Fourth Amendment's prohibition on the use of excessive force; and the Court accordingly denied qualified immunity for the officer applying the vascular neck restraint. Id.

The Tenth Circuit made an illustrative ruling in a case where the police applied a vascular neck restraint to the plaintiff twice, rendering him unconscious each time; but the first vascular neck restraint was applied while he was resisting arrest and the second vascular neck restraint was applied after the plaintiff had been handcuffed and his feet zip-tied together and the officers had struck him several times. McCoy v. Meyers, 887 F.3d 1034, 1038 (10th Cir. 2018). The Tenth Circuit panel found that no reasonable jury could conclude that the plaintiff was controlled before he was restrained with the handcuffs and zip-ties; and that the prior case law would not have put a reasonable officer on notice that the use of force on a dangerous individual who was not yet subdued was

unconstitutional.  Id.  However, the Tenth Circuit panel found that a reasonable jury could find that the second restraint violated the plaintiff's Fourth Amendment rights.  Id. at 1051.

Likewise, in Tuuamalemalo the Ninth Circuit found that the plaintiff was not resisting arrest at the time he was pinned to the ground by five officers and subjected to a lateral vascular neck restraint; on the other hand, the Ninth Circuit panel noted that the district court had found that earlier the plaintiff had resisted, and accordingly the district court granted qualified immunity to an officer who had punched the plaintiff in the face while he had been resisting. Tuuamalemalo, 946 F.3d at 476.  The district court had granted summary judgment in favor of all the officers sued but denied summary judgment in favor of the officer who placed the lateral vascular neck restraint on Tuuamalemalo and only that denial was appealed.  Id.

During the physical altercation in the instant case, the officers found Jeanniton to be extremely strong and angry, and he resisted any attempt to control him.  Fiesta Decl. ¶ 9. Officer Fiesta repeatedly ordered Jeanniton to stop resisting but he did not comply.  Id.  Officer Fiesta stated that Jeanniton was close to his gun and he was "worried if he overpowered me he could grab my weapon and injure myself or others."  Id. ¶ 10.  Corporal Fujinaka utilized the vascular

neck restraint in this volatile situation and, as instructed during training, he did not apply the restraint to obstruct Jeanniton's breathing.  Fujinaka Decl. ¶ 14.  Once Officer Fiesta was able to handcuff Jeanniton, both officers stopped all use of force.  Id.; Fiesta Decl. ¶ 13.

As discussed supra, Officer Fiesta did not put Jeanniton in a chokehold or vascular neck restraint.  Fiesta Decl. ¶ 13; Fujinaka Decl. ¶ 15.  Jeanniton admits Corporal Fujinaka was the officer who applied the vascular neck restraint.  Opp. at 24.  Even under Jeanniton's argument that Officer Fiesta acted in concert with Corporal Fujinaka to apply the restraint, the Court nevertheless finds that the restraint was not excessive under these circumstances.

Because Jeanniton, who was extremely strong, unrestrained, and aggressively resistant, prevented the officers from carrying out their duty to enter the apartment to ensure the safety and care of the subject woman and anyone else, the Court finds that any part Officer Fiesta played in Corporal Fujinaka's (again, who is not named as a defendant) placement of the vascular neck restraint did not constitute excessive force.

In any event, as discussed infra, the Court finds Officer Fiesta is entitled to qualified immunity on Jeanniton's entire excessive force claim.

### iii. Handcuffing

In his Opposition, Jeanniton cites precedent for the proposition that tight handcuffing can constitute excessive force.  See Opp. at 16 (citing Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993) and Hansen v. Black, 885 F.2d 642, 645 (9th Cir. 1989)).

In Palmer, the Ninth Circuit found that Defendants were not entitled to qualified immunity under the "reasonableness standard" of the Fourth Amendment because the officer fastened Palmer's handcuffs so tightly that they left bruises that lasted for several weeks, and the officer presented no evidence to justify his refusal to loosen the handcuffs after Palmer complained of the pain.  Palmer, 9 F.3d at 1436.

While Jeanniton was still in the recovery position, he told Corporal Fujinaka "my arm, take these off" and Corporal Fujinaka responded, "I'm sorry I can't do that right now."  Def. Ex. D.  Although Jeanniton did communicate to Corporal Fujinaka that he wanted the handcuffs removed, Def. Ex. A; three separate officers checked Jeanniton's handcuffs to make sure they were not too tight.  See Def. Ex. D; Fiesta Decl. ¶ 16; Fujinaka Decl. ¶ 16; Kaluhiokalani Decl. ¶ 4.  Moreover, Officer Fiesta's handcuffs were on Jeanniton for approximately ten minutes. Fiesta Decl. ¶ 18.  The Court finds Officer Fiesta's placement of his handcuffs on Jeanniton did not constitute excessive force

36

since Jeanniton was extremely angry and strong and physically resisted the officers' need to enter the apartment to ensure the safety of the occupants.

In Hansen, police arrested and handcuffed a woman whose son they suspected of a robbery, after she swore at them from about 75 feet away. Hansen, 885 F.2d at 642. In rendering its decision, the Ninth Circuit relied on the affidavit of a neighbor who witnessed the handcuffing, and as a result was "upset at the treatment [Hansen] was receiving." Id. at 645. By contrast, there is no third-party witness to the handcuffing here and Officer Fiesta faced more serious circumstances than that in Hansen. Jeanniton is a 5'8", 178-pound man who was formerly in the military and had training in hand-to-hand combat. Def. Ex. F at 74:17-24 and 86:24-87:4. Officer Fiesta was dispatched to respond to a domestic dispute involving Jeanniton, and was mere inches away from Jeanniton as he shouted and subsequently swung at Officer Fiesta. Def. Ex. A; Def. Ex. F at 158:6-24; Def. Ex. C; Fiesta Decl. ¶ 9. When Jeanniton physically resisted the officers' entry into the residence and almost overwhelmed the two of them and they were barely able to handcuff him, it was clear that the officers needed to keep Jeanniton securely handcuffed. The Court finds that given these circumstances, Officer Fiesta exerted a reasonable amount of force and needed to keep Jeanniton adequately secured with

handcuffs, and that no reasonable jury could find to the contrary.

In sum, the Court finds that Officer Fiesta's force was not excessive and in fact the officers were both calm throughout the incident (except during the actual physical encounter) and comforting Jeanniton throughout after he was restrained.  The officers reassured Jeanniton that he was not in trouble and coaxed him to talk with them, and after subduing him they placed a pillow behind his head while he was in the recovery position, and helped him sit up when he felt comfortable doing so.  See Def. Ex. D.  The officers also ensured that he had his medication with him before he left the residence.  See Def. Ex. A; Def Ex. C.

In any event, as discussed infra, the Court finds Officer Fiesta is entitled to qualified immunity on Jeanniton's entire excessive force claim.

### iv. Qualified Immunity

In evaluating qualified immunity in the context of excessive force, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  O'Doan v. Sanford, 991 F.3d 1027, 1036-37 (9th Cir. 2021) (quoting Kisela v. Hughes, 138 S. Ct.

1148, 1153, 200 L. Ed. 2d 449 (2018) (per curiam)).  The
question before the Court is whether "clearly established law
prohibited" Officer Fiesta from using the degree of force that
he did in the specific circumstances that the officers
confronted.  See City of Escondido, Cal. v. Emmons, 139 S. Ct.
500, 503, 202 L. Ed. 2d 455 (2019) (per curiam).

        Considering the facts of this case against the
applicable body of law, the Court concludes that Officer Fiesta
did not violate clearly established law and instead used
appropriately gradual force when he took Jeanniton to the
ground, told him to stop resisting, unsuccessfully attempted to
control his hands, tried to put Jeanniton in handcuffs, and used
his closed fist to strike Jeanniton's left torso in a further
effort to control Jeanniton's hands.  Officer Fiesta then
started to remove his spray gun in a further effort to control
Jeanniton, but was told by Corporal Fujinaka not to utilize the
spray gun.  Pl. Ex. 15K.  Officer Fiesta did not put Jeanniton
in a chokehold or vascular neck restraint.  Fiesta Decl. ¶ 13;
Fujinaka Decl. ¶ 15.  Jeanniton admits Corporal Fujinaka was the
officer who applied the vascular neck restraint.  Opp. at 24.

        As previously discussed, Officer Fiesta's use of force
was in direct response to Jeanniton's swing at him, compounded
by Jeanniton's great strength and forceful resistance to the
officers' need to enter the apartment to ensure the safety of

the occupants, and his refusal to comply with the officers'
commands.  See Mattos v. Agarano, 661 F.3d 433, 445 (9th Cir.
2011) (evaluating whether the plaintiff "bears some
responsibility for the escalation of the incident" in the
context of qualified immunity).  Jeanniton's failure to follow
"lawful commands, and [his] actions" in making threatening
gestures and his subsequent attack on Officer Fiesta "risked
severe consequences."  See Ames, 846 F.3d at 349.  The Court
finds that governmental interests in officer safety,
investigating a possible crime, and controlling an interaction
with a potential domestic abuser outweigh the intrusion upon
Jeanniton's rights.

Furthermore, the Court finds that "less intrusive
alternatives" would not have sufficed to bring Jeanniton under
control, especially when Jeanniton had refused to heed several
warnings to stop.  See Isayeva, 872 F.3d at 947; see also Rivas-
Villegas, 142 S. Ct. at 4 (holding that officer's conduct in
placing his knee on suspect's back for no more than eight
seconds, and only on the side of his back near the knife that
officers were in the process of retrieving, did not violate a
clearly established right against excessive force); Bond, 142 S.
Ct. at 9 (finding that officers who shot and killed suspect
after suspect raised hammer behind his head and took stance as
if he was about to throw the hammer or charge at the officers,

did not violate any clearly established law).  Both officers found Jeanniton to be extremely strong and that he almost overwhelmed them.  Fiesta Decl. ¶ 9; Fujinaka Decl. ¶ 12.  The officers feared for the safety for the woman inside and their own safety.  See Fujinaka Decl. ¶¶ 12-13; Fiesta Decl. ¶ 10 ("He was close to my gun and I was worried if he overpowered me he could grab my weapon and injure myself or others.").  While Jeanniton suffered some abrasions during this episode, his injuries were relatively minor; and after the officers checked on Simei's condition to be sure she was fine and obtained a witness statement from her, and notified Jeanniton that he was under arrest for harassment, Jeanniton was walked down the stairway to a police car.[11]

Further, Jeanniton identifies no precedent that would suggest with specificity that the force used here was excessive. See Rivas-Villegas, 142 S. Ct. at 4; Bond, 142 S. Ct. at 9. Moreover, the United States Supreme Court has held that qualified immunity protects an officer from civil liability [for

---

[11]  In his deposition, Jeanniton described his injuries from his physical altercation with the officers, listing a swollen eye, a cut lip and tongue, a three-inch long scratch, and swelling on his left wrist.  Def. Ex. F at 123:18-124:7.  Jeanniton had no broken bones, strains, sprains, torn ligaments, or concussions.  Id. at 107-114.  In Jeanniton's subsequent declaration he asserts additional injuries.  However, Jeanniton is not permitted to contradict his deposition testimony by a subsequent self-serving declaration claiming additional injuries.  Yeager, 693 F.3d at 1080 ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").  The Court further notes that there are numerous other statements in Jeanniton's declaration that are contradicted by his earlier deposition testimony and hence should be disregarded.  Reply at 2-4.

the use of force and applying handcuffs as well as applying a vascular neck restraint in subduing a person resisting the efforts of the officers' warrantless entry of a residence to ensure the safety of the occupants] if "a reasonable officer could have believed [such action] to be lawful, in light of clearly established law and the information the officer[] possessed." Anderson, 483 U.S. at 641, 107 S. Ct. at 3040; Bryant, 502 U.S. at 227, 112 S. Ct. at 536.  Here the Court finds a reasonable officer could have held such a belief under the subject circumstances.

For these reasons, the Court concludes that Officer Fiesta is entitled to qualified immunity on Jeanniton's entire § 1983 excessive force claim.

### c. False Arrest and Malicious Prosecution Claims

The Court next turns to Jeanniton's false arrest and malicious prosecution claims.

#### i. False Arrest

"To prevail on his section 1983 claim for false arrest . . . [the plaintiff] would have to demonstrate that there was no probable cause to arrest him." Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998); see also Norse v. City of Santa Cruz, 629 F.3d 966, 978 (9th Cir. 2010).

"To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest,

and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" Wesby, 138 S. Ct. at 586 (quoting Maryland v. Pringle, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003)).  Probable cause is "a fluid concept" that "deals with probabilities and depends on the totality of the circumstances," which cannot "readily, or even usefully, [be] reduced to a neat set of legal rules." Id. (internal quotations omitted).  It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. (quoting Illinois v. Gates, 462 U.S. 213, 243-44 n.13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).  This "is not a high bar." Id. (quoting Kaley v. United States, 571 U.S. 320, 338, 134 S. Ct. 1090, 188 L. Ed. 2d 46 (2014)).

Wesby "stressed that the 'specificity' of the rule is 'especially important in the Fourth Amendment context.'" Id. (internal quotations omitted).  Because of the "imprecise nature" of the probable cause standard, "officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered." Id. (internal quotations omitted).

The Court first finds that the officers had probable cause to arrest Jeanniton after the officers witnessed Jeanniton engage in unlawful conduct that included Jeanniton refusing to

43

comply with the officers' orders, and combatively engaging Officer Fiesta.  Jeanniton physically resisted the officers in their need to enter, and he was arrested for harassing Officer Fiesta.  The Court finds the officers could reasonably conclude they had probable cause to arrest Jeanniton based on their need to enter the apartment since being told by the neighbors that a woman inside the apartment was probably being beaten and further by Jeanniton's telling them look what Simei did to his lip. Jeanniton Decl. ¶ 126; see Def. Ex. A; Def. Ex. D.

Further, the Court finds that Jeanniton has failed to establish any genuine issue of material fact as to whether Officer Fiesta lacked probable cause, and that no reasonable jury would find to the contrary.  Jeanniton is therefore unable to establish his false arrest claim.

### ii. Malicious Prosecution

"In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right.'"  Awabdy v. City of Adelanto, 368 F.3d 1062, 1067 (9th Cir. 2004) (quoting Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995)).  Malicious prosecution actions are not limited to suits against prosecutors but may be brought against other

persons who have wrongfully caused the charges to be filed. Galbraith v. Cty. of Santa Clara, 307 F.3d 1119, 1126-27 (9th Cir. 2002).

As discussed supra, the Court finds that the officers had probable cause to arrest Jeanniton. Moreover, a prosecutor's independent decision to charge someone with the same crime they were arrested for creates a presumption that there was probable cause to arrest. Beck v. City of Upland, 527 F.3d 853, 862 (9th Cir. 2008). Such a presumption can be rebutted "by showing, for example, that the prosecutor was pressured or caused by the investigating officers to act contrary to his independent judgment or that the investigating officers presented the prosecution with information known by them to be false." Blankenhorn v. City of Orange, 485 F.3d 463, 482 (9th Cir. 2007) (internal quotation omitted). Jeanniton has made no showing that the prosecutorial judgment was in any way influenced or compromised and therefore the presumption of probable cause based on the prosecutor's choice to charge Jeanniton remains unrebutted.

Further, the Court finds that Jeanniton has failed to establish any genuine issue of material fact showing malice on the part of Officer Fiesta or that he lacked probable cause, and that no reasonable jury would find to the contrary.

### iii. Qualified Immunity Applies to Both the False Arrest and Malicious Prosecution Claims

Finally, Defendants argue that they are further entitled to qualified immunity on Jeanniton's claims of false arrest and malicious prosecution.  In considering whether Officer Fiesta is entitled to qualified immunity on this claim, the Court applies the same principles set forth above.

Moreover, the United States Supreme Court has held that "[o]ur cases establish that qualified immunity shields [officers] from suits for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'"  Bryant, 502 U.S. at 227, 112 S. Ct. at 536 (citing Anderson, 483 U.S. at 641, 107 S. Ct. at 3040).

The Court finds that a reasonable officer could have believed Jeanniton's arrest to be lawful in light of clearly established law and the information he possessed.

Jeanniton has not "identified a single precedent-much less a controlling case or robust consensus of cases-finding a Fourth Amendment violation under similar circumstances."  Wesby, 138 S. Ct. at 591 (internal quotation omitted).  Thus, "[w]hile there does not have to be a case directly on point" to deny qualified immunity, "existing precedent must place the lawfulness of the particular arrest beyond debate."  Id. at 590

46

(internal quotation omitted).  "[A] body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause."  Id. (internal quotation omitted).

Officer Fiesta is also therefore entitled to qualified immunity on Jeanniton's § 1983 false arrest and malicious prosecution claims.  See Rivas-Villegas, 142 S. Ct. at 4; Bond, 142 S. Ct. at 9.  For these reasons, the Court GRANTS Defendants summary judgment on those two claims.

## II.  First Amendment Retaliation Claim

Jeanniton asserts a First Amendment claim based on Officer Fiesta's physical force as retaliation "for Plaintiff exercising his First Amendment right of Free speech to articulate his basic Constitutional Right of the established expectation of the Privacy in his home; and to be free from unlawful searches and seizures . . . after stating his opposition to the warrantless entry and search of his home." TAC ¶ 26.  Defendants argue that Jeanniton did not engage in protected speech, that Jeanniton's speech did not cause Officer Fiesta to enter the house or arrest Jeanniton, and in any event that Officer Fiesta is entitled to qualified immunity.

Jeanniton's Opposition copies paragraphs from the Court's Prior Order finding that Jeanniton had sufficiently alleged a retaliation claim for purposes of the motion to dismiss.  See Opp. at 3-5.  But at the summary judgment stage,

47

Jeanniton is required to "go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." Far Out Productions, Inc. v. Oskar., 247 F.3d 986, 997 (9th Cir. 2001) (citing Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)).

A First Amendment retaliation claim requires "'that (1) [plaintiff] was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.'" Capp v. Cty. of San Diego, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting O'Brien v. Welty, 818 F.3d 920, 932 (9th Cir. 2016)).  To prevail on such a claim, a plaintiff must establish that the defendant's retaliatory animus was the "but-for" cause of the plaintiff's injury, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." Nieves v. Bartlett, 139 S. Ct. 1715, 1725, 204 L. Ed. 2d. 1, (2019).  The Court considers each of Defendants' arguments below.

### a. Protected Speech

As discussed in the Court's Prior Order, it is well settled that voicing criticism of the officers' conduct is constitutionally protected.  See Hartman v. Moore, 547 U.S. 250,

256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."); Ford v. City of Yakima, 706 F.3d 1188, 1192-93 (9th Cir. 2013) (per curiam) ("While an individual's critical comments may be 'provocative and challenging,' they are 'nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'") (quoting Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 93 L. Ed. 1131 (1949)), abrogated on other grounds by Nieves, 129 S. Ct. 1715, 204 L. Ed. 2d (2019).

Police have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech.  See Duran v. City of Douglas, 904 F.2d 1372 (9th Cir. 1990) (holding that a police officer's traffic stop and subsequent arrest of an individual who directed obscene gestures and words toward that officer was unlawful because it was well established that police officers may not exercise their authority for personal motives, especially in response to an individual's criticism or insults); see also Beck, 527 F.3d at 871 (holding that Duran clearly

established that police offices could not use their power to
retaliate against an individual for his free speech).

In their present motion, Defendants argue that
Jeanniton's speech-ordering Simei not to open the door-is
unprotected because it is speech integral to criminal conduct.
Mot. at 20.  While it is true that speech integral to criminal
conduct does not enjoy First Amendment protection, United States
v. Stevens, 559 U.S. 460, 468, 130 S. Ct. 1577, 176 L. Ed. 2d
435 (2010), the speech Jeanniton alleged was unrelated to Simei,
but rather his speech "exercising his First Amendment right of
Free speech to articulate his basic Constitutional Right of the
established expectation of the Privacy in his home; and to be
free from unlawful searches and seizures . . . after stating his
opposition to the warrantless entry and search of his home."
TAC ¶ 26.

Immediately before Officer Fiesta prevented Jeanniton
from closing his front door, Jeanniton had raised his hand in
the air, stepped out of the unit, assumed an aggressive stance,
and pointed at Officer Fiesta.  Def. Ex. C; Def. Ex. A; Def. Ex.
F at 158:6-24; Jeanniton Decl. ¶ 73.  Jeanniton yelled that she
was lucky he was not going to press charges, pointed to his lip,
and told the officers "fuck you."  Def. Ex. C; Def. Ex. A.
Jeanniton then made some type of backhanded motion with his
hand.  Def. Ex. C; Def. Ex. A; Def. Ex. F at 159:15-16.  Officer

Fiesta shouted, "Don't point!"  Jeanniton Decl. ¶ 75, before using his foot and body to prevent Jeanniton from closing the door.

The Court finds that Jeanniton's criticism of the police meets the elements of protected speech.

### b. Chilling Effect

The Court's inquiry under this prong is not whether Officer Fiesta's actions actually chilled Jeanniton, but whether the alleged retaliation "would chill a person of ordinary firmness from continuing to engage in the protected activity." O'Brien, 818 F.3d at 932 (quoting Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755 (9th Cir. 2006)).

The Court finds that Jeanniton's First Amendment retaliation claim clearly does not meet the "but for" causation requirement and therefore concludes there is no need to analyze whether there was a chilling effect.

### c. Causation

The final factor the Court must consider is whether there was a causal connection between Jeanniton's speech and Officer Fiesta's decision to enter the residence and physically restrain Jeanniton.

It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  See Nieves, 139 S. Ct. at 1722.

51

Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.  Hartman v. Moore, 547 U.S. 250, 260, 126 S. Ct. 1695, 164 L. Ed. 2d 441.

In Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977), a teacher claimed that a school district refused to rehire him in retaliation for his protected speech.  The Supreme Court held that even if the teacher's "protected conduct played a part, substantial or otherwise, in [the] decision not to rehire," he was not entitled to reinstatement "if the same decision would have been reached" absent his protected speech.  Id. at 285, 97 S. Ct. at 568.  Regardless of the motives of the school district, the Court concluded that the First Amendment "principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the [protected speech]."  Id. at 285-286, 97 S. Ct. 568.

Here, the officers had been told (1) by neighbors prior to entering the apartment that there was screaming and yelling and things slamming in the apartment and the woman was probably being beaten, and (2) by Jeanniton saying "look at what she did to my lip."  Moreover, it was clear that the officers could not leave to get a warrant, because that would involve

some time and would expose Simei and/or Jeanniton to be harmed (or further harmed).

As discussed _supra_, the officers lawfully entered the residence without a warrant based on the exigent circumstances and emergency aid exceptions, and the officers had probable cause to arrest Jeanniton.  As in <u>Mt. Healthy</u>, the same decision would have been reached-the officers forcefully entering Jeanniton's residence-absent his protected speech.

Further, the Court finds that Jeanniton has failed to establish any genuine issue of material fact regarding retaliation on the part of Officer Fiesta or that he lacked probable cause, and that no reasonable jury would find to the contrary.  For this reason, the Court GRANTS Defendants summary judgment with respect to Jeanniton's First Amendment retaliation claim.

### d. Qualified Immunity

Having determined that Defendants have met their burden on summary judgment with regard to Jeanniton's First Amendment retaliation claim, the Court moves to the second prong of the qualified immunity analysis:  whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  <u>Pearson</u>, 555 U.S. at 232, 129 S. Ct. 808.

The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair

warning that their conduct was unconstitutional.  Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).  Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech.  See Duran, 904 F.2d at 1375-78 (holding that a police officer's traffic stop and subsequent arrest of an individual who directed obscene gestures and words toward that officer was unlawful because it was well-established that police officers may not exercise their authority for personal motives, especially in response to an individual's criticism or insults).

However, the facts of Duran are materially distinguishable from this case and Jeanniton has not identified a single precedent finding a First Amendment retaliation violation under similar circumstances.

Moreover, the United States Supreme Court has held that qualified immunity protects an officer from civil liability for conducting a warrantless search of a residence if a reasonable officer could have believed the warrantless search to be lawful, in light of clearly established law and the information the officer possessed.  Anderson, 483 U.S. at 641, 107 S. Ct. at 3040); Bryant, 502 U.S. at 227, 112 S. Ct. at 536. Here, the Court finds a reasonable officer could have held such a belief under the subject circumstances.

54

Because there has been no First Amendment retaliation violation established, and in any event, Officer Fiesta is entitled to qualified immunity, the Court GRANTS Defendants summary judgment on Jeanniton's First Amendment retaliation claim.

## III. State Law Claims

The Court next addresses Jeanniton's state law claims of malicious prosecution, intentional infliction of emotional distress, assault, and battery.

### a. Malicious Prosecution Claim

A malicious prosecution claim requires a showing that "the prior proceedings were (1) terminated in the plaintiff's favor, (2) initiated without probable cause, and (3) initiated with malice." Young v. Allstate Ins. Co., 119 Haw. 403, 417, 198 P.3d 666, 680 (2008) (citing Brodie v. Hawaii Auto. Retail Gasoline Dealers Ass'n, Inc., 2 Haw. App. 316, 318, 631 P.2d 600, 602 (1981)). Notably, the tort of malicious prosecution is "not generally favored in our legal system, and thus its requirements are construed strictly against the party bringing the action." Young, 119 Haw. at 419, 198 P.3d at 682.

As discussed supra, the Court finds that there was probable cause. Furthermore, the Court finds no evidence of malice and indeed has found that except for the brief period in which the officers were subduing Jeanniton, the officers were

both calm and reassuring throughout the incident.  As discussed supra, the officers reassured Jeanniton that he was not in trouble and coaxed him to talk with them, and after subduing him they showed him the recovery position, placed a pillow behind his head while he was in the recovery position, asked if he was ready to sit up, asked to let the officer know when, instructed him to breathe deeply, told him "we are going to pick you up," asked if he was okay, and helped him sit up when he felt comfortable doing so, and told Jeanniton "I'm sorry I can't do that right now" in response to Jeanniton's request to remove his handcuffs.  See Def. Ex. D.  The officers also ensured that he had his medication with him before he left the residence.  See Def. Ex. A; Def Ex. C.  Neither Officer Fiesta nor Corporal Fujinaka knew Jeanniton prior to the incident and Officer Fiesta stated that he had no basis for ill will against Jeanniton. Def. Ex. F at 97:10-17; Fiesta Decl. ¶¶ 19-20.  Jeanniton has not established that either officer held any ill will toward him.

Moreover, the Court finds that Officer Fiesta is entitled to conditional privilege.  Under Hawaii law, government officials-when acting in the performance of their public duty-enjoy the protection of qualified or conditional privilege. Towse v. State, 64 Haw. 624, 647 P.2d 696 (1982).  The plaintiff must therefore prove to the requisite degree that the official

56

"was motivated by malice and not by an otherwise proper purpose." Medeiros v. Kondo, 55 Haw. 499, 522 P.2d 1269 (1974). Malice has been defined as "[t]he intent, without justification or excuse, to commit a wrongful act[,]" "reckless disregard of the law or of a person's legal rights[,]" and "[i]ll will; wickedness of heart." Awakuni v. Awana, 115 Haw. 126, 141, 165 P.3d 1027, 1042 (2007) (citing Black's Law Dictionary (8th ed. 2004)).

Here, there is no evidence that Officer Fiesta was motivated by any other purpose than the desire to do his job. Officer Fiesta is clear that he did not know Jeanniton prior to the incident and Officer Fiesta had no basis for ill will against Jeanniton.  Def. Ex. F at 97:10-17; Fiesta Decl. ¶¶ 19-20.  Because Jeanniton has not provided any evidence to meet the high bar of establishing malice, Officer Fiesta is also entitled to conditional privilege.

Further, the Court finds that Jeanniton has failed to establish any genuine issue of material fact showing malice on the part of Officer Fiesta or that he lacked probable cause and that Officer Fiesta is entitled to conditional privilege because Jeanniton has not shown malice, and that no reasonable jury would find to the contrary regarding those findings.

The Court therefore GRANTS Defendants summary judgment as to Jeanniton's malicious prosecution claim.

### b. Intentional Infliction of Emotional Distress Claim

Intentional infliction of emotional distress ("IIED") is an injury recognized by the Restatement of Torts as independently giving rise to liability.  Hac v. Univ. of Hawaii, 102 Haw. 92, 106, 73 P.3d 46, 60 (2003).  Under Hawaii law, the elements of IIED are "(1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another."  Id. at 106–07, 73 P.3d at 60–61.  The term "outrageous" has been construed to mean "without just cause or excuse and beyond all bounds of decency."  Lee v. Aiu, 85 Haw. 19, 34 n.12, 936 P.2d 655, 670 n.12 (1997) (internal quotation omitted).  Moreover, "extreme emotional distress" constitutes, inter alia, mental suffering, mental anguish, nervous shock, and other "highly unpleasant mental reactions." Hac, 102 Haw. at 106, 73 P.3d at 60 (footnote and citation omitted).

Under the circumstances of this case, the Court finds that Officer Fiesta's conduct does not rise to the level of "outrageousness" as construed in case law.  Moreover, there is nothing in the record to indicate that Jeanniton suffered any extreme emotional distress as a result of Officer Fiesta's conduct (although, as discussed supra, Jeanniton was manic and highly upset before there was any contact with the officers).

Jeanniton does discuss in his declaration that he sees a psychiatrist, Jeanniton Decl. ¶¶ 25, 138, but he has not alleged-let alone adduced any evidence to show-that his visits to psychiatrist are in any way related to his interaction with Officer Fiesta.  In his deposition, Jeanniton described his injuries from his physical altercation with the officers, listing a swollen eye, a cut lip and tongue, a three-inch long scratch and swelling to on his left wrist.  Def. Ex. F at 123:18-124:7.  Jeanniton had no broken bones, strains, sprains, torn ligaments, or concussions.  Id. at 107-114.  Jeanniton made no mention of any emotional distress.  See Publ'g Clearing House, Inc., 104 F.3d at 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); Yeager, 693 F.3d at 1080 ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

Because the Court finds Jeanniton fails to show that a genuine issue of material fact exists with respect to his IIED claim and, in any event, Officer Fiesta is entitled to conditional privilege because Jeanniton has not shown malice, and that no reasonable jury could find to the contrary regarding those findings, the Court GRANTS Defendants summary judgment on Jeanniton's IIED claim.

### c. Assault and Battery Claims

Under Hawaii law, "[a] person commits the common law tort of assault if he or she acts with intent to cause another a nonconsensual harmful or offensive contact or apprehension thereof, and the other person apprehends imminent contact." Mukaida v. Hawaii, 159 F. Supp. 2d 1211, 1223 (D. Haw. 2001).

A defendant "causes battery when he or she intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will." Williams v. Aona, 121 Haw. 1, 13, 210 P.3d 501, 513 (2009) (internal quotation omitted).

As discussed supra, the Court has found both that in forcing their entry there was probable cause and that the emergency aid and exigent circumstances exceptions to the warrant requirement apply.

Additionally, because Jeanniton has not provided evidence to meet the high bar of establishing malice, Officer Fiesta is also entitled to conditional privilege with regard to Jeanniton's state law claims of assault and battery.

Further, the Court finds that Jeanniton has failed to establish any genuine issue of material fact showing malice on the part of Officer Fiesta or that he lacked probable cause and that Officer Fiesta is entitled to conditional privilege because

Jeanniton has not shown malice, and that no reasonable jury would find to the contrary regarding those findings.

## IV.  Punitive Damages

Punitive damages serve to punish the defendant for wrongful conduct and to deter the defendant and others from repeating that wrong.  See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001).  A jury "may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).

Defendants argue that Jeanniton has failed to establish the malicious, wanton or oppressive conduct necessary to support a claim for punitive damages.  The Court agrees, especially given that the Court has found no violation of any laws.  See Mullaney v. Hilton Hotels Corp., 634 F. Supp. 2d 1130, 1152 (D. Haw. 2009) ("[A] claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action.") (quoting Ross v. Stouffer Hotel Co., 76 Haw. 454, 466, 879 P.2d 1037, 1049 (1994)).  The Court GRANTS Defendants summary judgment with regard to punitive damages.

## V.    Respondeat Superior

At the hearing, Jeanniton's counsel clarified that the only claim against the City and County is respondeat superior.

"Under Hawaii law, a municipality can have respondeat superior liability for torts maliciously committed by an employee acting within the scope of his authority." McCormack v. City & Cty. of Honolulu, 762 F. Supp. 2d 1246, 1253 (D. Haw. 2011).  The employee must be motivated by malice in his commission of the tort.  Hollandsworth v. City & Cty. of Honolulu, 440 F. Supp. 3d 1163, 1182 (D. Haw. 2020) (citing Alexander v. City & Cty. of Honolulu, 545 F. Supp. 2d 1122, 1136 (D. Haw. 2008)).

Because the Court has found no malice on the part of Officer Fiesta, and indeed no liability generally, the Court GRANTS Defendant City and County of Honolulu summary judgment.

## CONCLUSION

For the foregoing reasons, the Court dismisses all of Jeanniton's claims and GRANTS Defendants' Motion for Summary Judgment, ECF No. 66.  There being no remaining claims in this case, the Clerk's Office is DIRECTED to enter judgment and close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, April 15, 2022.



_____
Alan C. Kay
Sr. United States District Judge

Jeanniton v. The City and County of Honolulu, Mark Fiesta, Civ. No. 20-00369
ACK-WRP, Order Granting Defendants' Motion for Summary Judgment (ECF No. 66).